IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**GERALD H. HAWKINS**, individually
and as trustee of the CN Hawkins Trust and
Gerald H. Hawkins and Carol H. Hawkins
Trust, 2200 Los Viboras Road, Hollister,
CA 95023; **JOHN B. OWENS**, as trustee
of the John and Candace Owens Family
Trust, 13815 Trinity Ave. Red Bluff, CA
96080; **HARLOWE RANCH, LLC**,
2200 Los Viboras Road, Hollister, CA
95023; **GOOSE NEST RANCHES, LLC**,
57100 Highway 62, Fort Klamath, OR
97626, **AGRI WATER, LLC**, 53445
Highway 62, Fort Klamath, OR 97626;
**NBCC, LLC,** 53445 Highway 62, Fort
Klamath, OR 97626; **ROGER
NICHOLSON**; 53445 Highway 62, Fort
Klamath, OR 97626; **NICHOLSON
INVESTMENTS, LLC**, 11821 Nicholson
Road, Fort Klamath, OR 97626; **MARY
NICHOLSON**, as co-trustee of the
Nicholson Loving Trust, 12525 Nicholson
Road, Fort Klamath, OR 97626; **MARTIN
NICHOLSON**, individually and as
co-trustee of the Nicholson Loving Trust,
630 1st Ave.  N., #507, Fargo, ND 58102;
**RANDALL KIZER**, 8181 Loosley Road,
Fort Klamath, OR 97626; **RASCAL
RANCH, LLC**, 50309 Highway 62,
Chiloquin, OR 97624; **JACOX
RANCHES, LLC**, 13003 Nicholson Road,
Fort Klamath, OR 97626;  **E. MARTIN
KERNS**, 9350 Highway 99, Klamath Falls,
OR 97601; **TROY BROOKS** and
**TRACEY BROOKS**, 6262 E. Liberty
Road, Galt, CA 95632; **BARBARA A.
DUARTE** and **ERIC LEE DUARTE**, as
trustees of the Duarte Family Trust, UTD
January 17, 2002, 39220 Drews Road,
Beatty, OR 97621; **KEVIN NEWMAN**
and **JENNIFER NEWMAN**,
15350 Fishhole Creek Road, Bly, OR

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil No. 1:19-cv-1498

Action for Declaratory and Injunctive Relief
(Administrative Procedure Act, 5 U.S.C. §§
701-706)

**COMPLAINT**

97622; **DUANE MARTIN RANCHES, L.P.**, 2021 Highway 88, Ione, CA 95640; **GEOFFREY T. MILLER** and **CATHERINE A. MILLER,** as co-trustees of The Geoff and Catherine Miller Family Trust, UTD February 6, 2017, 4874 County Road FF, Orland, CA 95963; and **CASEY LEE MILLER,** as trustee of The Casey Miller Trust, UTD January 9, 2017, 4874 County Road FF, Oakland, CA 95963; **WILKS RANCH OREGON, LTD.**, 17018 Interstate 20, Cisco, TX 76437; **MARGARET JACOBS**, 29700 Ivory Pine Road, Bly, OR 97622; **DARRELL W. JACOBS**, 21755 Campbell Road, Bly, OR 97622; **FRANKLIN J. MELNESS** and **JANET G.  MELSNESS**, 62231 Hwy. 140E, Bly, OR 97622; **BARNES LAKE COUNTY, LLC**, 16258 Andy Hill Road, Lakeview, OR 97630; **DAVID COWAN** and **THERESA COWAN**, 62744 Hwy. 140E, Bly, OR 97622; and **VINCENT HILL**, 22500 Campbell Rd., Bly, OR 97622;

                      Plaintiffs,

  v.

**DAVID L. BERNHARDT,** Secretary of the Interior, 1849 C Street, NW, Washington, D.C. 20240; **TARA KATUK MAC LEAN SWEENEY,** Assistant Secretary—Indian Affairs, 1849 C Street, NW, Washington, D.C. 20240; **DARRYL LACOUNTE**, Director, U.S. Bureau of Indian Affairs, 1849 C Street, NW, Washington, D.C. 20240; and **BRYAN MERCIER**, Regional Director, U.S. Bureau of Indian Affairs, Northwest Regional Office, 911 NE 11th Ave., Portland, Oregon 97232;

                      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

# COMPLAINT

For their complaint, plaintiffs allege as follows:

## INTRODUCTION

1.       This is an action against the Hon. David L. Bernhardt, in his official capacity as Secretary of the Interior, Tar Katuk Mac Lean Sweeney, in her official capacity as the Assistant Secretary—Indian Affairs, Darryl LaCounte, in his official capacity as Director of the Bureau of Indian Affairs (BIA), and Bryan Mercier, in his official capacity as Regional Director for the Northwest Region of the BIA, for declaratory and injunctive relief from final agency action that is *ultra vires*, as well as in violation of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4347.   Specifically, this action challenges decisions by defendants to authorize the execution and implementation of an agreement (Protocol Agreement) with the Klamath Tribes, signed on May 30, 2013.  The Protocol Agreement unlawfully delegates to the Klamath Tribes authority to issue "calls" for state enforcement of instream water rights held by the United States, as trustee for the Klamath Tribes, for streams in the Upper Klamath Basin in Klamath County, Oregon.  This action also challenges defendants' connected final decisions to concur with, or accede to, such calls made under the Protocol Agreement without first evaluating the effects to the human environment, and considering alternatives to the resulting widespread irrigation shut-offs against plaintiffs and the entire Upper Basin community, in accordance with NEPA.  Plaintiffs seek declaratory and injunctive relief declaring the Protocol Agreement unlawful, declaring each of the calls issued in 2013 and 2017 through 2019 unlawful, setting aside and vacating each of those decisions, and enjoining defendants from making any further calls for enforcement of the United States' instream water rights unless and until defendants have complied with NEPA and have determined that any such calls are in the general public interest and would further the general welfare of the Nation.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), § 2201 (declaratory relief) and § 2202 (injunctive relief).  Plaintiffs have challenged final agency actions as defined by the Administrative Procedure Act (APA), 5 U.S.C. § 704. Venue in this district is proper under 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims occurred in this district, and/or defendants Bernhardt, Sweeney and LaCounte reside in this district.  This action is timely under 28 U.S.C. § 2401(a)(1) because the Protocol Agreement was executed on May 30, 2013 and defendants have subsequently concurred with, or acceded to, calls issued by the Klamath Tribes for enforcement of instream water rights held by the United States in each year since the Protocol Agreement was executed.

## PARTIES

### Wood River Landowners

3.    Plaintiffs Gerald B. Hawkins, individually and as a trustee of the CN Hawkins Trust and Gerald H. Hawkins and Carol H. Hawkins Trust; John B. Owens, as a trustee of the John and Candace Owens Family Trust; Harlowe Ranch, LLC, an Oregon limited liability company; Goose Nest Ranches, LLC, an Oregon limited liability company; Agri Water, LLC, an Oregon limited liability company; NBCC, LLC, an Oregon limited liability company; Roger Nicholson; Nicholson Investments, LLC, an Oregon limited liability company; Mary Nicholson, as trustee of the Nicholson Loving Trust; Martin Nicholson, individually and as co-trustee of the Nicholson Loving Trust; Rascal Ranch, LLC, an Oregon limited liability company; JaCox Ranch, LLC, an Oregon limited liability company; and E. Martin Kerns (collectively, Wood River Landowners) are the owners of thousands of acres of real property in the Wood River Valley in Klamath County,

Oregon. They[1] use and enjoy their ranches for multiple purposes including, but not limited to: cattle ranching, growing pasture grasses, recreation, observing and experiencing wildlife, boating, fishing, and hunting. Wood River Landowners' ability to use and enjoy their properties is dependent on having access to water for irrigation.

4.    Wood River Landowners' properties have appurtenant water rights that allow for the diversion of water from the Wood River and/or its tributaries Fort Creek, Crooked Creek, Annie Creek, and Sun Creek for the purpose of irrigation and stock watering. Wood River Landowners use the water to irrigate their pastures for growing grass to feed cattle. Wildlife such as waterfowl, migratory birds (such as red-tailed hawks, owls and bald eagles), amphibians, reptiles, deer and elk depend on Wood River Landowners' irrigated pastures for habitat, refuge, and feed. Wood River Landowners enjoy observing and experiencing wildlife on their private property.

5.    Some Wood River Landowners' water rights have been provisionally recognized in the Klamath Basin Adjudication as having a priority date of 1864, originating under the Klamath Treaty. 16 Stat. 707. Some of Wood River Landowners' ranches were formerly part of the Agency Unit of the Klamath Indian Irrigation Project that was funded and developed by the U.S. Indian Irrigation Service commencing in 1900. Other Wood River Landowners hold water rights that were adjudicated in a prior state adjudication of the Wood River, with pre-1909 priority dates. Finally, some Wood River Landowners also hold water rights that were issued by OWRD after 1909, including groundwater rights.

/ / /

/ / /

---

[1] For corporate entities, references to Wood River Landowners' use and enjoyment of their properties, and associated injuries, refer to their corporate owners, members, and managers.

### Sprague River Landowners

6.      Plaintiffs Troy Brooks and Tracey Brook, husband and wife; Barbara A. Duarte and Eric Lee Duarte, as trustees of the Duarte Family Trust, UTD January 17, 2002; Kevin Newman and Jennifer Newman, husband and wife; Duane Martin Ranches, L.P., a California limited partnership; Geoffrey T. Miller and Catherin A. Miller, as Co-Trustees of The Geoff and Catherine Miller Family Trust, UTD February 6, 2017; Casey Lee Miller, as Trustee of The Casey Miller Trust, UTD January 9, 2017; Wilks Ranch Oregon, Ltd., a Texas limited partnership; Margaret Jacobs; Darrell W. Jacobs; Franklin J. Melsness and Janet G. Melsness; Barnes Lake County, LLC, an Oregon limited liability company; David Cowan and Theresa Cowan, husband and wife; and Vincent Hill (collectively, Sprague River Landowners) are the owners of thousands of acres of real property in the Sprague River Valley, as well as along tributaries of the lower Williamson River, all in Klamath County, Oregon.  They[2] use and enjoy their real properties for multiple purposes including, but not limited to: cattle ranching, growing pasture grasses, recreation, observing and experiencing wildlife, boating, fishing, and hunting.  Sprague River Landowners' ability to use and enjoy their properties is dependent on having access to water for irrigation.

7.      Sprague River Landowners' properties have appurtenant water rights that allow for the diversion of water from the Sprague River and/or its tributaries, as well as from the Lower Williamson River and its tributaries, including Larkin Creek and Spring Creek, for the purposes of irrigation and stock watering.  Sprague River Landowners use the water to irrigate their pastures for growing grass to feed cattle.  Wildlife such as waterfowl, migratory birds, amphibians and deer

---

[2] For corporate entities, references to Sprague River Landowners' use and enjoyment of their properties, and associated injuries, refer to their corporate owners, members, and managers.

depend on Sprague River Landowners' irrigated pastures for habitat, refuge and feed. Sprague River Landowners enjoy observing and experiencing wildlife on their private property.

8.    Some Sprague River Landowners' water rights have been provisionally recognized in the Klamath Basin Adjudication as having a priority date of 1864, originating under the Klamath Treaty.  16 Stat. 707.  Some of Sprague River Landowners' members are part of the Chiloquin Unit, Spring Creek Unit and Yainax Unit of the Klamath Indian Irrigation Project that was first planned, funded and/or developed by the U.S. Indian Irrigation Service commencing in the early 1900s.  Other Sprague River Landowners hold water rights that were adjudicated in a prior state adjudication of the Sprague River, with pre-1909 priority dates.  Finally, some Sprague River Landowners also hold water rights that were issued by OWRD after 1909, including groundwater rights.

### Defendants

9.    Defendant Bernhardt, the Secretary of Interior, is the official responsible for supervising several federal agencies with an interest in the Klamath Basin, including the BIA, the Bureau of Reclamation (BOR), and the Fish and Wildlife Service (FWS).  Defendant Bernhardt, in addition, is the primary official responsible for making policy-decisions that balance the United States' Indian trust responsibilities with the United States' other varied interests and obligations owed to all people of the Nation.  *See* Letter from Griffin B. Bell, Attorney General, to Cecil D. Andrus, Secretary of Interior (May 31, 1979).  *See also* Memorandum to the Attorney General from John M. Harmon, Assistant Attorney General, Office of Legal Counsel (August 11, 1977) [hereinafter Harmon Memo].  Particularly pertinent here, Defendant Bernhardt is responsible for the United States' policy decisions on Indian trust matters which affect private landowners and irrigators in the Upper Klamath Basin such as plaintiffs, including with respect to lands that were

formerly part of the Klamath Indian Reservation and which the Department of Interior supported developing for irrigation and agriculture from the early 1900s through the 1960s.

10.    The Secretary has been personally involved in significant recent decisions affecting plaintiffs and the Upper Klamath Basin, decisions which are part of the subject matter of this case, including the Upper Klamath Basin Comprehensive Agreement (UKBCA) and the Klamath Basin Restoration Agreement (KBRA). *See* 82 Fed. Reg. 61582 (December 28, 2017). Secretary Sally Jewel personally visited the Upper Klamath Basin to participate in the signing ceremony for the UKBCA with plaintiffs and the other signatories. *See* https://www.doi.gov/news/pressreleases/historic-upper-klamath-basin-agreement-signed-along-banks-of-spring-creek. The UKBCA specifically referenced, and contemplated defendants utilizing, the Protocol Agreement to issue calls for enforcement of United States-held water rights against plaintiffs. Secretary Bernhardt is sued in his official capacity only.

11.    Defendant Sweeney, the Assistant Secretary—Indian Affairs is, pursuant to 25 U.S.C. § 2, responsible for management of all Indian affairs and of all matters arising out of Indian relations, under the direction of Secretary Bernhardt. Assistant Secretary Sweeney is sued in her official capacity only.

12.    Defendant LaCounte, the Director of the BIA, is the official in charge of the BIA and supervising the activities and decisions of the BIA's Regional Offices, including the Northwest Region and its regional director. Director LaCounte is sued in his official capacity only.

13.    Defendant Mercier is the Regional Director for the Northwest Regional Office of the BIA. His predecessor, Stanley Speaks, signed the Protocol Agreement on May 30, 2013. Regional Director Mercier is sued in his official capacity only.

/ / /

/ / /

## BACKGROUND ALLEGATIONS

14.    Plaintiffs' ranches are located throughout what is known as the Upper Klamath Basin in Klamath County, Oregon.  Plaintiffs' ranches drain the Wood River, the Sprague River, the Williamson River, and their tributaries, into Upper Klamath Lake, which, in turn, empties into the mainstem Klamath River.  The Upper Klamath Basin contains approximately 180,000 acres of irrigated pasture, the development of much of which was supported by the U.S. Indian Irrigation Service in the early 1900s, but which has been actively declining since 2013 because of decisions by defendants that have drastically curtailed irrigation.  Plaintiffs' ranches are home to an array of wildlife that depend on irrigation for providing habitat that is important for carrying out behavioral functions, including feeding and sheltering. Numerous plant communities located on plaintiffs' ranches also rely on irrigation.

15.    On September 29, 1975, the United States filed a complaint in Oregon Federal District Court against private landowners in the Upper Williamson River basin in Klamath County, Oregon to "determine the extent of the rights appurtenant to lands presently owned by the defendants and the extent of the rights of plaintiff to utilize the waters." *United States v. Adair*, Case No. 75-914 (D. Or.) (plaintiff's complaint); *see also id.*, 478 F. Supp. 336 (D. Or. 1979) (*Adair I*).  The district court held that, under the Klamath Treaty, the Tribes had an implied right to "all of the water rights necessary to protect their hunting and fishing rights[,]" with a "time immemorial" priority date.  *Adair I*, 478 F. Supp. at 345.  The Ninth Circuit Court of Appeals affirmed this ruling with the clarification that the water right consisted of "the amount of water necessary to support its hunting and fishing rights as currently exercised to maintain the livelihood of Tribe members, not as these rights once were exercised by the Tribe in 1864." *United States v. Adair*, 723 F.2d 1394, 1414-15 (1983) (*Adair II*).  The Ninth Circuit left to the State of Oregon the task of quantifying the water right in a state adjudication.

16.     The district court also recognized that, in addition to supporting the Klamath Tribes' hunting and fishing rights, the Treaty's other primary purpose was "to encourage agriculture," and that non-Indian landowners were "entitled to an 1864 priority date for water rights appurtenant to their land which formerly belonged to the Klamath Indians." *United States v. Adair*, Case No. 75-914 (D. Or.) (final judgment). Many of these lands, "approximately 25% of the original Klamath Reservation," were developed and passed on to non-Indians under the General Allotment Act of 1887. *Adair II*, 723 F.2d at 1398. Several plaintiffs are owners of those government-allotted lands, as described in paragraphs 5 and 8, above.

17.     The Department of Interior was responsible for transferring those allotted lands to the predecessor-in-interest of many of the plaintiffs. In 1958, the Solicitor for the United States Department of Interior released a memorandum indicating that the Department of Interior would "support the rights of Indian landowners and third party purchasers of Klamath [Reservation] lands as having" water rights under the Klamath Treaty of 1864. The Department of Interior provided this support during the termination period of the Klamath Reservation, according to the Solicitor, "in order to give potential non-Indian purchasers of land some assurance of rights to the use of water on the land they purchase." The Department of Interior's position coincided with a long history of the federal government's enthusiastic support for the development of all the available water from the streams within the former Reservation ("former Reservation") for irrigation and agriculture. At the Secretary's direction, in the early 1900s the U.S. Indian Irrigation Service filed notices and applications with the state engineer to develop all the available water from the Wood River, Sprague River, and Williamson River for irrigation and agriculture. *See Adair I*, 478 F Supp at 339-340 (referencing the Williamson River application).

18.     Despite those actions by the Department of Interior to support irrigation development and agriculture on many of the lands now owned by plaintiffs, in 1997, the United

States filed instream water right claims, as trustee for the Klamath Tribes, for practically all the available water in the Wood River and tributaries, Sprague River and tributaries, and the Williamson River and tributaries in Oregon's general stream adjudication for the Klamath Basin (Klamath Basin Adjudication or KBA), for the purpose of supporting the Klamath Tribes' fishing and hunting rights, relying on *Adair II*.

19.     Following a lengthy administrative proceeding and hearings, the State of Oregon, by and through the Oregon Water Resources Department (OWRD), issued its findings of fact and order of determination (FFOD) for the KBA on March 7, 2013.   The FFOD provisionally determined more than 700 water right claims filed in the KBA, subject to parties' rights to file exceptions to OWRD's findings and determinations in state circuit court pursuant to Oregon Revised Statute (ORS) 539.150.  Under ORS 539.130(4), the determined water rights claims went into "full force and effect," pending the state circuit court's resolution of parties' exceptions.

20.     In the FFOD, OWRD provisionally awarded to the United States, as trustee for the Klamath Tribes, substantial instream water right claims for the Wood River and two of its tributaries, Fort Creek and Crooked Creek, the Sprague River and several of its tributaries, including Five Mile Creek, and the lower Williamson River and several of its tributaries, including Larkin Creek and Spring Creek.  The instream water rights were quantified at such high levels that, if enforced at their full levels, they leave little water, and in many cases no water, available for irrigation uses throughout the entire Upper Klamath Basin. These water cut-offs have directly injured plaintiffs' private ranches, many of which were developed for irrigation with the active support of the Department of Interior, led by the Secretary. The Wood River Landowners and Sprague River Landowners filed exceptions to OWRD's determinations, in state circuit court, and those exceptions remain pending. The exceptions are not likely to be resolved for several more years.

21.     In the FFOD, OWRD also provisionally awarded several Wood River Landowners and Sprague River Landowners irrigation water rights with an 1864 priority date, pursuant to the Klamath Treaty. Despite identifying those very same lands for irrigation development in the early 1900s, by and through the U.S. Indian Irrigation Service, the United States has filed exceptions to OWRD's determinations of several of those claims, seeking to have them severely limited or denied, and those exceptions remain pending.  The exceptions are not likely to be resolved for several more years.

22.     In the FFOD, OWRD specifically determined that the tribal instream water rights would not be held by the Klamath Tribes and would, instead, be held by the United States, as trustee, based on the U.S. Supreme Court's holding in *Colorado River Water Conservation Distr. v. United States*, 424 U.S. 800, 810 (1976).  In response, defendants, by and through the BIA's Regional Director for the Northwest Region, entered into the Protocol Agreement on May 30, 2013.  The Protocol Agreement delegates to the Klamath Tribes the United States' authority and discretion to make "calls" for the State of Oregon, by and through OWRD, to prohibit junior water uses when the streamflows are not being met, under Oregon's prior appropriation doctrine system of water right regulation.

23.     The Protocol Agreement authorizes the Klamath Tribes to contact OWRD to formally issue calls for enforcement of the instream water rights, after providing notice to the BIA. In the absence of such calls, OWRD would not prohibit junior water users from exercising their water rights.  The Protocol Agreement provides that, within two business days of receiving notice for the Tribes, the BIA will provide an email response stating either: "(i) agreement with making the proposed call, (ii) changes to the scope of the proposed call, (iii) disagreement with making the proposed call and the reasons for that disagreement or, (iv) that BIA needs an additional business day to complete deliberations on the call notice."

24.     In the event BIA disagrees with a call, or the scope of the call, and the dispute cannot be resolved within two business days, the Protocol Agreement empowers the Klamath Tribes to nonetheless proceed to issue the call, notwithstanding BIA's objections.  In such event, the Protocol agreement specifically provides that the BIA "will not object to the call[,]" effectively waiving any final review authority of the agency to prohibit or modify the call.

25.     Pursuant to the Protocol Agreement, in June, 2013, the Klamath Tribes, by and through the power and authority delegated by defendants, issued calls to OWRD which resulted in OWRD issuing final orders directing hundreds of landowners throughout the Upper Klamath Basin, including plaintiffs, to cease all irrigation.

26.     Following the 2013 shut-off, the United States and the State of Oregon sought to find a solution for this basin-wide crisis by bringing landowners and the Klamath Tribes together to reach a comprehensive water right settlement.  This effort resulted in execution of the Upper Klamath Basin Comprehensive Agreement (UKBCA) on April 18, 2014, between the State of Oregon, Klamath Tribes, and landowners in the Upper Klamath Basin, including most of the plaintiffs to this action.  Former Secretary of Interior, Sally Jewell, personally participated in the signing ceremony for the UKBCA on the banks of the Lower Williamson River.

27.     Defendants, or their predecessors, and/or their direct subordinates, were directly involved in the negotiation, and subsequent implementation, of the UKBCA, as well as related and connected agreements, including the Klamath Basin Restoration Agreement (KBRA) and the Klamath Hydroelectric Settlement Agreement (KHSA).  Section 13.3 of the UKBCA specifically provided: "[n]othing in this Agreement is intended to affect the agreement between the Klamath Tribes and the BIA when placing calls pursuant to the May 24, 2013 Protocol Agreement between the Klamath Tribes and the BIA, which is on file with OWRD, amended as needed from time to time."

28.     The UKBCA included a Water Use Program (WUP) that significantly reduced the magnitude of the instream flows awarded to the United States in the KBA to flows called "Specified Instream Flows" (SIF).  The SIFs consisted of lower streamflow levels that were designed to support fish and wildlife resources important to the Klamath Tribes while also providing irrigation opportunities for plaintiffs and other irrigators and, consequently, a sustainable basis for the continuation of irrigated agriculture in the Upper Klamath Basin.

29.     Pursuant to the Protocol Agreement, in 2014, 2015, and 2016, the Klamath Tribes, by and through the power and authority delegated by defendants, issued calls to OWRD for enforcement of the SIFs designated under the UKBCA.  Although these modified calls mitigated some of the environmental and economic impacts in the Upper Klamath Basin by allowing more land to be irrigated, including lands owned by plaintiffs, many landowners, including some plaintiffs, still experienced significant curtailment to their water use.  Despite these impacts, plaintiffs acknowledge that the calls for enforcement to the SIFs were issued under the agreement reached in the UKBCA.

30.     In 2017, citing a lack of progress in implementing the UKBCA (due to lack of federal funding), the Klamath Tribes, by and through the power and authority delegated by defendants, issued calls to OWRD for enforcement of the full instream flow level water rights held by the United States, instead of at the SIF levels.  OWRD's enforcement of these calls resulted in widespread and severe curtailment of irrigation, and in many cases complete shut-offs, against plaintiffs and similarly-situated landowners in the Upper Klamath Basin.

31.     On December 28, 2017, the former Secretary of Interior, Ryan Zinke, issued a "Negative Notice" in the Federal Register terminating the UKBCA.  82 Fed. Reg. 61582 (December 28, 2017).  The following spring, in 2018, the Klamath Tribes, by and through the power and authority delegated by defendants, and in coordination with defendants, issued calls to

OWRD for enforcement of the full instream flow level water rights held by the United States. OWRD's enforcement of these calls resulted in widespread and severe curtailment of irrigation, and in many cases complete shut-offs, against plaintiffs and similarly-situated landowners in the Upper Klamath Basin.

32.    In April 2019, the Klamath Tribes, by and through the power and authority delegated by defendants, issued blanket calls to OWRD for enforcement of the full instream flow level water rights held by the United States.  OWRD's enforcement of these calls will imminently result in the severe curtailment of irrigation, and in many cases complete shut-offs, against plaintiffs and similarly-situated landowners in the Upper Klamath Basin.

33.    In the course of the Klamath Tribes' calls for water right enforcement in each of 2013 through 2019, defendants, or defendants' direct subordinates, have been consulted on the Klamath Tribes' desire to make the calls.  Defendants, or defendants' direct subordinates, have been involved in decision-making processes related to the Klamath Tribes' calls.

34.    For instance, in 2015, John Bezdek, former Counsel to the Deputy Secretary, was consulted on, and involved with, decision-making related to the Klamath Tribes' proposed call. Mr. Bezdek, who had been appointed by former Secretary Sally Jewell as the 'point person' from the Secretary's office for Klamath water-related issues, including the negotiation and implementation of the UKBCA, had direct oversight and decision-making responsibility for the calls issued from 2014-2016, for the Secretary. In place of the role that Mr. Bezdek formerly served, Defendant Bernhardt has appointed Alan Mikkelson, as Senior Advisor to the Secretary on Water and Western Resource Issues, to serve as the point person for Klamath water-related issues, including termination of the UKBCA and ongoing efforts to reach a new basin-wide settlement agreement,.  Mr. Mikkelson reports directly to defendant Bernhardt on Klamath water-related issues.

35.     Mr. Mikkelson has made, and continues to make, regular trips to the Klamath Basin on the Secretary's behalf to facilitate the development of long-term permanent solutions to the basin's natural resource crises.  On behalf of the Secretary, Mr. Mikkelson provides direction to various federal agencies with interests in the Klamath Basin, including the BIA, the BOR and FWS.  Mr. Mikkelson has had direct oversight responsibility for the calls issued from 2017-2019, which were issued pursuant to the Protocol Agreement.

36.     As a direct result of the calls issued from 2013-2019, plaintiffs have suffered, and will continued to suffer, substantial injuries to their aesthetic, environmental, recreational and other interests.  These injuries include: (1) the reduction and loss of wildlife on plaintiffs' ranches as a result of irrigation curtailments; (2) the infestation of weeds and other undesirable plants as a result of irrigation curtailments; (3) and the wholesale loss of grass plant communities on portions of some of plaintiffs' ranches as a result of irrigation curtailments.  These environmental impacts are among the kinds that are required to be analyzed and considered under NEPA before a federal agency decides to undertake a major federal action.

37.     In addition, plaintiffs and other similarly-situated landowners are suffering social and economic injuries by virtue of lost revenues and substantially reduced property values which, in turn, have had substantial and devastating negative socioeconomic impacts on the entire Upper Klamath Basin agricultural community.  These environmental and social justice impacts are also required to be analyzed and considered under NEPA.

38.     Defendants' acts and omissions in delegating authority to the Klamath Tribes to make these calls, and the resulting Tribe-initiated calls on water rights held by the United States and made without compliance with NEPA, are causing plaintiffs real and substantial injuries. The relief sought in this lawsuit will redress injuries to plaintiffs' interests.

/ / /

## DECLARATORY AND INJUNCTIVE RELIEF ALLEGATIONS

39.    An actual and substantial controversy exists between plaintiffs and defendants. Plaintiffs contend that the Protocol Agreement constitutes an unlawful delegation of power, and that the Agreement, as well as calls made pursuant to it, result in significant impacts to the human environment that require an environmental impact statement under NEPA. Defendants, however, contend that the Protocol Agreement is lawful and that NEPA does not apply to it nor to calls made pursuant to it. Declaratory relief is therefore appropriate to resolve this dispute.

40.    If an injunction does not issue precluding defendants from continuing to operate under the Protocol Agreement, and to allow calls to be made thereunder without compliance with NEPA, plaintiffs will be irreparably harmed. The water shut-offs that have occurred pursuant to the Protocol Agreement have significantly injured plaintiffs' aesthetic, recreational, and agricultural interests. The cut-offs have significantly affected the human environment, by among other things reducing water fowl habitat and converting pasture and other usable rangeland into dusty and weed-infested fields.  Once damaged, these habitats and plant communities take years to try to re-establish and recover.  These environmental effects of the shut-offs—all directly attributable to the Protocol Agreement and calls made thereunder—have injured plaintiffs' aesthetic and other interests in the native flora and fauna of their lands and the Upper Klamath Basin as a whole. Absent an injunction, defendants will continue to implement the Protocol Agreement and allow calls to be made thereunder, because the political and environmental factors that have led to the creation of the Protocol Agreement and its repeated implementation will persist into the foreseeable future. Plaintiffs have no plain, speedy, and adequate remedy at law for their economic and aesthetic injuries. Money damages in this case are not available.

/ / /

/ / /

## FIRST CLAIM FOR RELIEF

**(Against all defendants; unlawful delegation of federal agency authority;**
***ultra vires* final agency action under 5 U.S.C. § 706(2)(A)-(C))**

41.     Plaintiffs reallege the allegations in paragraphs 1 through 40 as if fully set forth herein.

42.     43 U.S.C. § 1451 authorizes the "executive department to be known as the Department of the Interior, and a Secretary of Interior, who shall be the head thereof." 43 U.S.C. § 1541. The Secretary of Interior is "charged with the supervision of the public business relating to[,]" *inter alia*, "Indians." 43 U.S.C. § 1457.

43.     25 U.S.C. § 1a authorizes the Secretary of Interior to "delegate, from time to time … his powers and duties under said laws to the Commissioner of Indian Affairs," aka the Assistant Secretary—Indian Affairs.  25 U.S.C. § 1a. The section authorizes the Commissioner to re-delegate, but only to assistant commissioners or other officers within BIA. *Id*. No constitutional or statutory provision authorizes the delegation of power to make final decisions concerning Indian water rights held in trust by the United States to an Indian tribe.

44.     Under the unlawful delegation doctrine, a federal agency acts *ultra vires* whenever it attempts, without constitutional or statutory authorization, to sub-delegate decision-making authority. Such sub-delegation is presumed to be unlawful when made to non-federal entities or persons. *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565-66 (D.C. Cir. 2004).

45.     The Protocol Agreement is a final agency action subject to the APA.  The Protocol Agreement delegates to the Klamath Tribes the authority to issue calls for the enforcement of federal reserved water rights that are held by the United States.  *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 810 (1976).  With respect to such federal

reserved water rights held by the United States, the Klamath Tribes do not possess any independent or residual authority.

46.    In approving, authorizing the execution of, and executing the Protocol Agreement—and in carrying out federal actions pursuant to the Agreement annually—defendants have unlawfully delegated to the Klamath Tribes the authority to make calls for enforcement of federal reserved water rights held by the United States.  In the Protocol Agreement, defendants unlawfully waived the Secretary's power and authority to object to, suspend, modify or otherwise change a call proposed by the Klamath Tribes, unless agreed-to by the Klamath Tribes. *See generally* Harmon Memo at 9 ("[T]he Secretary may conclude that, even after taking th[e] presumption [of construing statutes to favor Indian interests] into account, he may legally follow a course of action not favored by the Indians."). In doing so, defendants acted in manner arbitrary, capricious, contrary to law, contrary to constitutional rights, power, privilege or immunity, and in excess of jurisdiction, authority, or limitations or short of statutory right. 5 U.S.C. § 706(2)(A)-(C).

## SECOND CLAIM FOR RELIEF

### (Against all defendants; violation of NEPA in concurring with, or acceding to, calls for enforcement of United States-held water rights; unlawful agency action under 5 U.S.C. § 706(2)(A)-(D))

47.    Plaintiffs reallege the allegations in paragraphs 1 through 46 as if fully set forth herein.

48.    NEPA is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). It serves two purposes: (1) "it ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) it "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the

implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

49.     NEPA requires agencies to prepare an environmental impact statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS must "provide full and fair discussion of significant environmental impacts." 40 C.F.R. § 1502.1. Agencies must consider every significant aspect of the environmental impact of a proposed action. This includes studying the direct, indirect, and cumulative impacts of the action. *See* 40 C.F.R. §§ 1508.7, 1508.8.

50.     Analysis prepared in order to satisfy NEPA must include consideration of a reasonable range of alternatives to a proposed action. 42 U.S.C. § 4332(2)(C)(iii); *see also* 40 C.F.R. § 1502.14 (alternatives including the proposed action).

51.     Pursuant to the unlawful Protocol Agreement, in each of 2013, 2017, 2018, and 2019 defendants have allowed for the issuance of calls for enforcement of United States-held water rights to the substantial injury to plaintiffs and the environment.  In so allowing, defendants have exercised considerable discretion without observance or compliance with NEPA.  In waiving their right to object to, or modify, calls proposed by the Klamath Tribes in the Protocol Agreement, defendants unlawfully decided that they would not evaluate the potential environmental impacts of the calls nor consider alternatives to the Klamath Tribes' preferred course of action.

52.     Each of the calls has constituted "major federal actions" under NEPA. Additionally, and/or alternatively, defendants' program and/or protocol for making those calls is a major federal action under NEPA.

53.     In allowing for the issuance of the calls, especially in each of 2013 and 2017 through 2019, defendants violated NEPA, including but not limited to the requirement to prepare an EIS under 42 U.S.C. § 4332(2)(C).  Defendants acted in manner arbitrary, capricious, contrary

to law, in excess of jurisdiction and authority, and without observance of procedures requirement by law, in violation of 5 U.S.C. § 706(2)(A)-(D).

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for a judgment granting the following relief;

1.    A declaration that the Protocol Agreement is a final agency action constituting an *ultra vires* and therefore unlawful sub-delegation of agency authority, in violation of 5 U.S.C. § 706(2)(A)-(C).

2.    A declaration that the calls for enforcement of the United States-held water rights in each of 2013, 2017, 2018 and 2019 violated NEPA and therefore constitute final agency actions that were arbitrary, capricious, contrary to law, in excess of jurisdiction and authority, and without observance of procedures required by law, in violation of 5 U.S.C. § 706(2)(A)-(D).

3.    An order reversing, setting aside, vacating and/or remanding the Protocol Agreement and each of the calls made in 2013, 2017, 2018, and 2019.

4.    An injunction prohibiting defendants from issuing any more calls until such time as defendants have fully complied with the law, including their obligation to make a final, independent decision on the propriety of a call, having taken into account the general public interest and welfare, as well as NEPA;

5.    An award of plaintiffs' reasonable costs, litigation expenses, and attorney's fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*, and any other applicable authorities;

6.    Granting to plaintiffs such other relief as may be just and equitable.

/ / /

/ / /

/ / /

Respectfully submitted this 22nd day of May, 2019.

**YOCKIM CAROLLO LLP**

s/ Dominic M. Carollo
**Dominic M. Carollo,** Or. State Bar No. 093057
DC Bar ID# OR0011
630 SE Jackson Street, Suite 1
P.O. Box 2456
Roseburg, Oregon 97470
Phone: (541) 957-5900
Fax: (541) 957-5923
dcarollo@yockimlaw.com

Of Attorneys for Plaintiffs